UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,

<table>
<tr><td>Plaintiff,</td><td>15-cv-3642 (PKC)</td></tr>
<tr><td>-against-</td><td>MEMORANDUM<br>AND ORDER</td></tr>
</table>

MONARCH PAYROLL, INC., STUART
GRANT and DANIEL COX,

         Defendants.
-----------------------------------------------------------x
CASTEL, U.S.D.J.

    Plaintiff National Union Fire Insurance Company of Pittsburgh, PA ("National Union") alleges that the defendants undertook a scheme to provide unenforceable letters of credit in exchange for the return of $2,390,000 in cash collateral held by National Union. Those letters of credit were intended to secure the payment of insurance deductibles from defendant Monarch Payroll, Inc. ("Monarch") under National Union policies.

    In a series of e-mails, National Union and Monarch agreed to the contents of the letters of credit and arranged for the transfer of $2,390,000 to Monarch. The parties agree that these e-mails formed an enforceable contract. According to National Union, instead of enforceable letters of credit, Monarch provided "worthless" placeholder letters, retained the $2,390,000 and intentionally failed to deposit the funds required to make the letters of credit enforceable.

    Subject matter jurisdiction is premised on diversity of citizenship, 28 U.S.C. § 1332(a)(1), and National Union brings claims under New York law for fraud, conversion and breach of contract. Pursuant to Rule 12(b)(6), Fed. R. Civ. P., Monarch moves to dismiss the

fraud and conversion claims in their entirety, and the breach of contract claim as it relates to

defendants Stuart Grant and Daniel Cox, both of whom are officers of Monarch.  Separately,

National Union moves for partial summary judgment in its favor on its breach of contract claim

against Monarch.

For the reasons explained, Monarch's motion to dismiss is granted in its entirety,

and National Union's claims are dismissed with the exception of its breach of contract claim

against Monarch.  As to this remaining breach of contract claim against Monarch, National

Union has come forward with evidence entitling it to summary judgment in its favor, and

Monarch's evidence in opposition does not defeat the motion.  National Union's motion for

partial summary judgment is therefore granted.

THE DEFENDANTS' MOTION TO DISMISS IS GRANTED.

For the purposes of deciding the motion to dismiss, all non-conclusory factual

allegations are accepted as true, and all inferences are drawn in favor of plaintiff National Union.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

A.   The Parties.

National Union is a Pennsylvania corporation with its principal place of business

in New York.  (Compl't ¶ 4.)  For several years, National Union issued high-deductible workers'

compensation insurance policies to Monarch Consulting Inc. ("Monarch Consulting").  (Compl't

10.)

Monarch Consulting was the predecessor to defendant Monarch.  (Compl't ¶ 1.)

Monarch is a California corporation with its principal place of business in California.  (Compl't ¶

5.)  Defendant Stuart Grant, a citizen of California, is the CEO of Monarch and was the CEO of

Monarch Consulting.  (Compl't ¶ 6.)  Defendant Daniel Cox, also a California citizen, is the

CFO of Monarch, and also was CFO of Monarch Consulting.  (Compl't ¶ 7.)

> B.  <u>The Policies' Deductibles and the Related Letters of Credit.</u>

National Union issued workers' compensation insurance policies to Monarch

Consulting beginning in 2003, with the most recent policy issued in October 2010.  (Compl't ¶

10.)  The policies had deductibles as high as $350,000, with an aggregate total deductible of

$2,390,000.  (Compl't ¶¶ 11, 13.)

In October 2007, National Union and Monarch Consulting entered into a side-

agreement (the "Payment Agreement") to secure Monarch Consulting's payment of deductibles.

(Compl't ¶ 12.)  The Payment Agreement required Monarch Consulting to obtain "an evergreen

letter of credit" for the duration of the policies.  (Compl't ¶ 12.)  Until March 13, 2015, National

Union held letters of credit issued by Sterling Bank, which secured Monarch Consulting's

payment obligations in the amount of $2,390,000.  (Compl't ¶¶ 12-13.)

On March 13, 2015, defendant Daniel Cox sent an e-mail to Jason Goldy, an

associate general counsel at National Union, stating that Sterling Bank had canceled the letters of

credit, effective immediately.  (Compl't ¶ 18.)  Cox's e-mail stated that the parties were in

"agreement" that the outstanding liability on the deductibles was "far less" than $2,390,000, and

asked if National Union would agree to new letters of credit totaling between $750,000 and

$1,000,000.  (Compl't ¶ 18.)  Goldy replied that, on the contrary, the Payment Agreement

required Monarch to maintain letters of credit totaling $2,390,000, and that National Union had a

right to draw down on the cash collateral if Monarch did not provide replacement letters of credit

in the same amount.  (Compl't ¶ 18.)

C.   <u>The Parties' Agreement Concerning Replacement Letters of Credit.</u>

According to the Complaint, after Sterling Bank canceled the letters of credit, Monarch and National Union entered into a new contract whereby Monarch promised to provide replacement letters of credit approved by National Union.  The contract, it is alleged, was formed through a series of e-mails.  Monarch does not dispute that it entered into a contract with National Union.  National Union alleges that Monarch breached that contract, and that the contract was an instrument of defendants' alleged acts of fraud and conversion.

On March 16, 2015, National Union sent a draw-down request to Sterling Bank for the full amount of the cash collateral.  (Compl't ¶ 19.)  Upon learning of the request, Cox e-mailed Goldy, stating that the action was "punitive" and that it would "blow a hole in my balance sheet."  (Compl't ¶ 20.)  As characterized by the Complaint, Cox "then hatched a scheme" to obtain the cash collateral held by National Union while also terminating its obligation to maintain letters of credit.  (Compl't ¶ 20.)

On March 17, Cox, the CFO of Monarch, asked National Union whether it would return the cash collateral if Monarch Consulting did not challenge the National Union draw down and obtained new letters of credit totaling $2,390,000 in an acceptable form from an acceptable institution.  (Compl't ¶ 21.)  Goldy, the associate general counsel of National Union, replied that if Monarch Consulting did so on or before May 1, 2015, National Union would refund the cash collateral.  (Compl't ¶ 22.)  Cox replied, "We are in agreement."  (Compl't ¶ 22.)

National Union contends, and Monarch does not dispute for the purposes of these motions, that these e-mails formed another, new contract whereby Monarch promised to provide letters of credit in a form acceptable to National Union, at which time National Union would return the cash collateral to Monarch.   (Compl't ¶¶ 16-17, 21-23.)

D. <u>The Parties' Negotiations over the UBS Letters of Credit.</u>

Negotiations ensued about the contents of the letters of credit and National

Union's transfer of the cash collateral. (Compl't ¶ 23.) On April 1, 2015, Cox informed Goldy

that UBS would issue letters of credit on behalf of Monarch, and asked Goldy to confirm that the

attached draft letters were acceptable. (Compl't ¶ 23.) National Union confirmed that UBS was

an acceptable institution for issuing the letters of credit, and added that the letters needed minor

revisions. (Compl't ¶ 23.) Monarch revised the letters accordingly, and Goldy told Cox that the

draft letters were now in an acceptable form. (Compl't ¶ 23.)

On April 9, 2015, Cox told Goldy that the letters would be executed within days.

(Compl't ¶ 24.) Cox suggested that the parties' outside counsel facilitate the exchange of the

letters of credit for the cash collateral. (Compl't ¶ 24.) Goldy responded that outside counsel

need not be consulted because the parties had already agreed to the logistics of the exchange, and

stated that "[o]nce we get your LCs we'll return the money as we agreed to." (Compl't ¶ 24.)

On April 20, 2015, Monarch's outside attorney e-mailed Goldy and stated that

Monarch would arrange to have the letters of credit issued and delivered. (Compl't ¶ 27.) On

April 21, Goldy stated that Monarch needed to correct certain forms in order for the wire

payment to proceed, and stated that payment would be made only to Monarch and to no other

entity. (Compl't ¶ 28.) In response, Monarch's attorney noted that National Union now had all

necessary documents, and stated, "Please process the return of the cash per the UBS wire

instructions. The letters of credit will be delivered today or tomorrow." (Compl't ¶ 28.)

E. The Transmission of the Placeholder Letters of Credit, Defendants' Receipt of the
<u>Cash Collateral and National Union's Subsequent Communications.</u>

On April 22, 2015, National Union received from UBS three placeholder letters of

credit in an aggregate amount of $2,390,000. (Compl't ¶ 30.) Each letter had an all-caps

disclaimer at the top of the front page, stating that the letter "is not operative and will only go into effect once USD 2,390,000.00 is received by UBS AG, New York Branch . . . .  Once the funds are received, we will issue an amendment rendering this Letter of Credit operative.  Should we not receive the funds and issue our amendment by April 29, 2015, then this Letter of Credit will be null and void."  (Compl't ¶ 30; Popofsky Dec. Ex. I.)

On April 27, 2015, National Union wired $2,390,000 to Monarch's account at Sterling Bank.  (Compl't ¶ 32.)  Monarch received the funds.  (Compl't ¶ 33.)  However, Monarch did not deposit the funds with UBS prior to the April 29, 2015 deadline established in the placeholder letters of credit.  (Compl't ¶ 35.)  National Union alleges that defendants intentionally failed to deposit the funds, and that they never intended to provide enforceable letters of credit.  (Compl't ¶¶ 33, 34.)

On May 1, 2015, National Union learned that defendants had not timely deposited the funds with UBS, and that the letters of credit were not enforceable.  (Compl't ¶ 39.)  Goldy e-mailed defendants and counsel stating as much, and added that "we'll take appropriate action" if the funds were not deposited immediately.  (Compl't ¶ 39.)  Defendants and their attorney did not respond.  (Compl't ¶ 39.)  National Union's attorneys contacted Monarch's attorney on May 4, 2015, and again threatened legal action.  (Compl't ¶ 40.)  Monarch's attorney later e-mailed National Union's attorneys stating that he had not finished discussing the matter with his client. (Compl't ¶ 42.)

National Union states that it would not have wired the $2,390,000 to the Sterling Bank account, "but for the numerous false and material misrepresentations and omissions that Defendants made to National Union regarding the provisions of valid and operative letters of

credit in the aggregate amount of $2,390,000." (Compl't ¶ 37.)  To date, Monarch still has not provided enforceable letters of credit.  (Compl't ¶ 36.)

RULE 12(b)(6) STANDARD.

       To survive a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Legal conclusions are not entitled to the presumption of truth, and a court assessing the sufficiency of a complaint disregards them.  Id.  Instead, the Court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679.  "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

       A court reviewing a Rule 12(b)(6) motion "does not ordinarily look beyond the complaint and attached documents in deciding a motion to dismiss brought under the rule." Halebian v. Berv, 644 F.3d 122, 130 (2d Cir. 2011).  A court may, however, "consider 'any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference . . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.'" Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 100 (2d Cir. 2015) (quoting Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)).

DISCUSSION.

        I.       <u>National Union's Fraud Claim Is Dismissed.</u>

           A.  The Complaint Does Not Plausibly Allege Fraud under New York <u>Law.</u>

In moving to dismiss the fraud claim, defendants do not rely on Rule 9(b), Fed. R. Civ. P., which requires that "a party must state with particularity the circumstances constituting fraud or mistake." Instead, they argue that the Complaint fails as a matter of law to allege a fraud claim that is distinct from a breach of contract claim. For the reasons explained, the Court concludes that the fraud claim alleges non-performance of the contract, and does not plausibly allege fraud under New York law. The defendants' motion is therefore granted as to the fraud claim.

"The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." <u>Eurycleia Partners, LP v. Seward & Kissel, LLP</u>, 12 N.Y.3d 553, 559 (2009). "A cause of action alleging fraud does not lie where the only fraud claim relates to a breach of contract. A present intent to deceive must be alleged and a mere misrepresentation of an intention to perform under the contract is insufficient to allege fraud." <u>Jeffers v. Am. Univ. of Antigua</u>, 125 A.D.3d 440, 442 (1st Dep't 2015).

Surveying New York law, the Second Circuit observed that the state's courts recognize three situations in which a plaintiff has a viable fraud claim based on a defendant's alleged breach of contract. <u>See</u> <u>Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.</u>, 98 F.3d 13, 20 (2d Cir. 1996). First, the plaintiff may "demonstrate a legal duty separate from the duty to perform under the contract." <u>Id.</u>; <u>accord</u> <u>Verizon New York, Inc. v. Optical Communications Group, Inc.</u>, 91 A.D.3d 176, 179-80 (1st Dep't 2011) ("A fraud claim may

coexist with a breach of contract cause of action only where the alleged fraud constitutes the breach of a duty separate and apart from the duty to abide by the terms of the contract."); Brown v. Brown, 12 A.D.3d 176, 176-77 (1st Dep't 2004) ("a simple breach of contract claim may not be considered a tort unless a legal duty independent of the contract – i.e., one arising out of circumstances extraneous to, and not constituting elements of, the contract itself – has been violated.").  Actionable, extra-contractual duties may exist when, for example, a defendant's fiduciary duty raises obligations beyond those of a contracting party, or when a breach of a contract results in physical injury or threatens public safety as opposed to an injury that is "solely financial."  Verizon, 91 A.D.3d at 179-82 (discussing duties implicated by defendant's obligation to secure public safety); Andersen ex rel. Andersen, Weinroth & Co., L.P. v. Weinroth, 48 A.D.3d 121, 136 (1st Dep't 2007) (discussing fiduciary duty).

Second, a plaintiff may have a viable fraud claim if it can "demonstrate a fraudulent misrepresentation collateral or extraneous to the contract."  Bridgestone/Firestone, Inc., 98 F.3d at 20.  In Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954, 956 (1986), the New York Court of Appeals concluded that plaintiff stated a fraud claim when defendant allegedly did not intend to abide by the geographic restrictions that he orally promised as an inducement for plaintiff to enter into the contract.  See also Graubard Mollen Dannett & Horowitz v. Moskovitz, 86 N.Y.2d 112, 122 (1995) (allegedly false oral statements concerning defendant's retention of clients stated a fraud claim when defendant failed to perform under the contract).  A misrepresentation of present fact, as opposed to an intention to perform in the future, also may support a fraud claim.  GoSmile, Inc. v. Levine, 81 A.D.3d 77, 81-82 (1st Dep't 2010) (fraud claim not duplicative of contract claim when defendant allegedly misrepresented facts concerning his possession of confidential information).

- 9 -

Third, a plaintiff may have a viable fraud claim if it can prove "special damages that are caused by the misrepresentation and unrecoverable as contract damages." Bridgestone/Firestone, 98 F.3d at 20.  "[T]he damages recoverable for a breach of contract are meant to place the nonbreaching party in as good a position as it would have been had the contract been performed; the damages recoverable for being fraudulently induced to enter a contract are meant to indemnify for the loss suffered through that inducement, e.g., damages for foregone opportunities."  Manas v. VMS Associates, LLC, 53 A.D.3d 451, 454 (1st Dep't 2008) (internal citations and quotation marks omitted); see also Deerfield, 68 N.Y.2d at 956 (fraud claim not duplicative of contract claim because fraud damages reflected loss caused by inducement and not breach); Laduzinski v. Alvarez & Marsal Taxand LLC, 132 A.D.3d 164, 168 (1st Dep't 2015) (fraud claim was viable because it sought damages for a change of employment induced by alleged misrepresentations in defendant's employment agreement).

By contrast, a defendant's failure to perform under a contract does not give rise to a fraud claim.  New York courts have consistently held that "[g]eneral allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support [a fraud] claim."  New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 318 (1995); see also Demetre v. HMS Holdings Corp., 127 A.D.3d 493, 494 (1st Dep't 2015) ("The court, however, properly dismissed the fraud claim as duplicative of the breach of contract claim, as plaintiffs were alleging only that [defendant] misrepresented its intent to perform the contractual obligations at the time they were made."); Lucker v. Bayside Cemetery, 114 A.D.3d 162, 175 (1st Dep't 2013) ("Mere allegations that a party entered into a contract lacking the intent to perform are insufficient to establish a claim of misrepresentation or fraud."); Maxim Grp. LLC v. Life Partners Holdings, Inc., 690 F. Supp. 2d 293, 308 (S.D.N.Y. 2010) ("It is well-settled in New

York, though, that a contract claim cannot be converted into a fraud claim by the addition of an allegation that the promisor intended not to perform when he made the promise.") (Preska, C.J.).

Here, National Union's fraud claim is based on the allegation that defendants never intended to provide enforceable letters of credit, as promised in the agreement.  When the breach of contract claim is viewed alongside the fraud claim, the underlying allegations are nearly identical.  The breach of contract claim alleges that the parties "entered into a contract via an exchange of e-mails whereby Defendants agreed not to contest Plaintiff's draw down of Defendants' prior letters of credit and to provide new, valid letters of credit in the aggregate amount of $2,390,000, in exchange for the $2,390,000 in cash collateral held by Plaintiff," while the parallel fraud claim alleges that through e-mail communications, defendants promised to provide valid and enforceable letters of credit in exchange for $2,390,000 in cash collateral. (Compl't ¶¶ 48, 61.)  The breach of contract claim alleges that National Union performed its obligations by wiring $2,390,000 to defendants and that defendants breached the contract by failing to take steps that would have made the placeholder letters of credit operative, while the fraud claim similarly alleges that defendants sent placeholder letters of credit that did not become operative, even after National Union wired defendants $2,390,000.  (Compl't ¶¶ 49-50, 62-63.)

The fraud claim includes allegations that the defendants "willfully concealed" facts "with the intent to deceive and thereby defraud" National Union, "concocted a scheme" to obtain the funds, and undertook "fraudulent conduct" that "was intentional and malicious." (Compl't ¶¶ 46-47, 49.)  Aside from these labels, the conduct behind the alleged fraud is identical to the conduct in the breach of contract claim.  The fraud allegations are "all based on the same facts as the cause of action to recover damages for breach of contract," and do not "allege distinct, cognizable causes of action."  Edem v. Grandbelle Int'l, Inc., 118 A.D.3d 848,

849 (2d Dep't 2014).  Drawing every inference in National Union's favor, the Complaint makes only "[g]eneral allegations" that defendants entered into a contract "while lacking the intent to perform it . . . ."  <u>New York Univ.</u>, 87 N.Y.2d at 318.

National Union argues that the fraud claim is not duplicative to the breach of contract claim because the contract was merely "an instrument" in a "larger fraudulent scheme" to obtain the $2,390,000.  (Opp. Mem. at 14-15.)  But the only "scheme" alleged in the Complaint relates to the parties' agreement concerning the letters of credit, and defendants' alleged failure to perform their obligations.

National Union also argues that because a fraud claim may allow for punitive damages, the Complaint seeks "special damages" not recoverable on its breach of contract claim. But the First Department has held that the inclusion of a prayer for punitive damages is not a sufficient basis to allow a fraud claim that is based on the breach of a contract.  <u>Mosaic Caribe, Ltd. v. AllSettled Grp., Inc.</u>, 117 A.D.3d 421, 422-23 (1st Dep't 2014) (concluding that "the fraud claim was duplicative of the breach of contract claim," and that despite "an unelaborated request for punitive damages in connection with the fraud claim, the proposed amended complaint seeks the same damages as the breach of contract claim, specifically, return of the deposit plaintiff paid pursuant to the contract.").

At bottom, National Union had in hand on April 22, 2015 three placeholder letters of credit from UBS, which expressly recited that the letters "will only go into effect once USD $2,390,000.00 is received by UBS, AG New York Branch . . . ."  With this information in hand, National Union freely wire transferred the funds not to UBS but to Sterling Bank at the direction of Monarch.  The change in identity of the transferee bank, according to the Complaint, was a result of an attachment to an e-mail from Monarch's lawyers.  National Union undoubtedly

- 12 -

believed that Monarch would transfer the funds to UBS, but without more, no claim for fraud is stated.

Because National Union's fraud claim is duplicative of its breach of contract claim, the fraud claim is dismissed.

II.    National Union's Conversion Claim Is Dismissed.

The conversion claim is dismissed for substantially the same reasons as the fraud claim.  "A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession."  Colavito v. New York Organ Donor Network, Inc., 8 N.Y.3d 43, 49-50 (2006).  "Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights."  Id. at 50 (internal citations omitted).

A conversion claim "cannot be predicated on a mere breach of contract," when "no independent facts are alleged giving rise to tort liability."  Kopel v. Bandwidth Tech. Corp., 56 A.D.3d 320, 320 (1st Dep't 2008); see also New York Univ., 87 N.Y.2d at 316 ("where a party is merely seeking to enforce its bargain, a tort claim will not lie."); Fesseha v. TD Waterhouse Inv'r Servs., Inc., 305 A.D.2d 268, 269 (1st Dep't 2003) (dismissing conversion claim that was "nothing more than a restatement of [plaintiff's] breach of contract claim.").  A plaintiff must plausibly alleged that the defendant violated a duty that is distinct from its contractual obligations.  D'Ambrosio v. Engel, 292 A.D.2d 564, 564-65 (2d Dep't 2002).

As with the fraud claim, the Complaint's conversion claim is a repackaged breach of contract claim.  It alleges that National Union wired $2,390,000 to Sterling Bank on April 27, 2015 and that defendants have unlawfully obstructed National Union's "right to possess the

funds . . . ."  (Compl't ¶¶ 53, 54.)  The conversion claim seeks $2,390,000 in damages.  (Compl't ¶ 59.)  The conversion claim does not allege "independent facts . . . giving rise to tort liability." Kopel, 56 A.D.3d at 320.  It does not allege a duty that is distinct from defendants' contractual obligations, D'Ambrosio, 292 A.D.2d at 564-65, and is based on the same conduct as the breach of contract claim, Fesseha, 305 A.D.2d at 269.

Accordingly, the Complaint's conversion claim is dismissed.

III.    The Breach of Contract Claim Is Voluntarily Dismissed as to Cox and Grant.

Defendants move to dismiss the breach of contract claim as it pertains to Grant and Cox.  "It is well established that officers or agents of a company are not personally liable on a contract if they do not purport to bind themselves individually."  Georgia Malone & Co. v. Ralph Rieder, 86 A.D.3d 406, 408 (1st Dep't 2011); see also Kremer v. Sinopia LLC, 104 A.D.3d 479, 480 (1st Dep't 2013) (managing member of LLC cannot be held personally liable for LLC's alleged breach of agreement); Wiernik v. Kurth, 59 A.D.3d 535, 537 (2d Dep't 2009) ("persons may not be held personally liable on contracts of their corporations, provided they did not purport to bind themselves individually under such contracts.").

In its opposition brief, National Union states that it "agrees" that Cox and Grant were not parties to the contract, and therefore "withdraws its breach of contract claim against Defendants Cox and Grant."  (Opp. Mem. 2 n.2.)  The breach of contract claim is therefore dismissed as to Grant and Cox.

IV.    Separately, the Fraud and Conversion Claims Are Dismissed as to Grant.

The Court concludes, sua sponte, that the Complaint fails to allege any conduct by Grant that plausibly states a claim for fraud or conversion.  For this separate and independent reason, both claims are dismissed as they relate to Grant.

The Complaint identifies Grant as the CEO of Monarch Payroll and Monarch Consulting. (Compl't ¶ 6.) Its only other allegation concerning Grant states that he was one of several recipients copied on an e-mail of April 9, 2015, in which Cox proposed the submission of letters of credit in exchange for National Union's payment of $2,390,000. (Compl't ¶ 24.) The Complaint attributes no statements or actions to Grant.

These minimal allegations do not plausibly allege liability as to Grant. Regarding the fraud claim, Rule 9(b) requires a complaint to "(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006). The Complaint identifies no statements made by Grant.

Moreover, "the 'commission of a tort' doctrine permits personal liability to be imposed on a corporate officer for misfeasance or malfeasance, i.e., an affirmative tortious act; personal liability cannot be imposed on a corporate officer for nonfeasance, i.e., a failure to act." Peguero v. 601 Realty Corp., 58 A.D.3d 556, 559 (1st Dep't 2009). The Complaint alleges no acts of malfeasance on the part of Grant as to how he plausibly could be liable for either fraud or conversion.

Because the Complaint does not attribute conduct to Grant that plausibly alleges liability for fraud or conversion, those claims against Grant are dismissed.

NATIONAL UNION'S SUMMARY JUDGMENT MOTION IS GRANTED.

National Union moves for summary judgment in its favor on its breach of contract claim against Monarch. According to National Union, the undisputed facts establish that the parties entered into a contract whereby National Union promised to return $2,390,000 in cash collateral, conditioned on Monarch submitting letters of credit in a form acceptable to National

Union.  National Union contends that Monarch failed to deposit the funds necessary to make the letters of credit effective, thereby breaching the contract.

Monarch has not argued that it requires fact discovery in order to oppose the summary judgment motion.  See Rule 56(d) (providing that if a non-movant believes that discovery is required to oppose summary judgment, it may submit an affidavit or declaration explaining "that, for specified reasons, it cannot present facts essential to justify its opposition . . . .").  Indeed, Monarch does not dispute the above-recited facts.  Instead, it asserts in opposition that it fully performed every obligation imposed upon it by the contract and that it intends to raise defenses that challenge National Union's underlying entitlement to hold cash collateral.

For the reasons explained, the Court concludes that National Union has come forward with evidence that entitles it to judgment as a matter of law, and that Monarch's evidence in opposition would not permit a reasonable jury to find in its favor.  National Union's summary judgment motion is therefore granted.

SUMMARY JUDGMENT STANDARD.

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (quotation marks omitted).  It is the initial burden of the movant to come forward with evidence on each material element of his claim or defense, demonstrating that he is entitled to relief, and the evidence on

each material element must be sufficient to entitle the movant to relief in its favor as a matter of law.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008).  "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248).  "A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation."  Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008) (internal citations omitted).  An opposing party's facts "must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions."  Contemporary Mission, Inc. v. U.S. Postal Serv., 648 F.2d 97, 107 n.14 (2d Cir. 1981) (quotation marks omitted).

THE PRE-DISCOVERY TIMING OF NATIONAL UNION'S MOTION.

Rule 56(b) provides that "[u]nless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery."  "[P]re-discovery summary judgment is the exception rather than the rule and will be granted only in the clearest of cases."  Wells Fargo Bank Northwest, N.A. v. Taca Int'l Airlines, S.A., 247 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) (Lynch, J.) (quotation marks omitted).  In a breach of contract case, pre-discovery summary judgment may be appropriate if a court is tasked with applying the undisputed terms of an agreement.  Id.; see also XL Specialty Ins. Co. v. Agoglia, 2009 WL 1227485, at *6 (S.D.N.Y. Apr. 30, 2009) ("where it is clear that

the nonmoving party cannot defeat the motion by showing facts sufficient to require a trial for resolution, summary judgment may be granted notwithstanding the absence of discovery.") (Lynch, J.) *(*citing <u>Gottlieb v. County of Orange</u>, 84 F.3d 511, 519 (2d Cir. 1996)).

The parties submitted pre-motion letters prior to National Union's filing of this summary judgment motion.  National Union wrote to the Court describing its proposed motion and requesting a briefing schedule.  (Docket # 23.)  Monarch's response described the motion as an attempt "to procedurally oppress defendants," characterized it as an attempt to engage in piecemeal litigation and disputed the merits.  (Docket # 27.)  The Court then set a briefing schedule.  (Docket # 29.)  As noted, Monarch has never asserted that it requires discovery or additional facts in order to oppose the motion.

The Court also notes that Monarch's opposition turns in part on certain defenses it claims that it would raise in an Answer.  (Opp. Mem. 19-20.)  Rule 56 does not require an answer to be filed before a party moves for summary judgment.  Rule 56(b) ("a party may file a motion for summary judgment <u>at any time</u> until 30 days after the close of all discovery.") (emphasis added).  The Court therefore treats Monarch's proposed defenses as arguments in opposition to National Union's motion.

FACTS.

The relevant facts are undisputed.  As discussed in relation to the motion to dismiss, National Union issued "large deductible" workers' compensation policies to Monarch and its predecessor, and required Monarch to obtain evergreen letters of credit to secure the payment of $2,390,000 in aggregate deductibles. (Pl. 56.1 ¶¶ 1-3; Def. 56.1 Resp. ¶¶ 1-3,)  In March 2015, Sterling Bank canceled Monarch's letters of credit, after which National Union

drew down on the $2,390,000 posted on the letters.  (Pl. 56.1 ¶¶ 11-13; Def. 56.1 Resp. ¶¶ 11-13.)

In a series of e-mails, National Union and Monarch agreed that National Union would return the cash collateral if Monarch posted new, acceptable letters of credit on or before May 1, 2015.  (Pl. 56.1 ¶¶ 15-16; Def. 56.1 Resp. ¶¶ 15-16.)  Monarch, via Cox, agreed to the proposed contract that Goldy sent in an e-mail:

> National Union will draw down on the following LOCs, which Monarch will not contest, and hold the funds as cash collateral . . . .  In return, National Union will agree to refund to Monarch the cash collateral proceeds totaling $2.39 million in the event Monarch posts replacement LOCs on or before May 1, 2015 in an acceptable form and at a National Union approved bank, and the applicants in both transactions are identical.

(Cox Dec. Ex. T at 11-12.)  Cox replied, on behalf of Monarch, "Thank you.  We are in agreement."  (Cox Dec. Ex. T at 11.)

The parties agreed to the wording of draft letters of credit posted through UBS, which included a prominent disclaimer stating that the letters were not operative and would not go into effect until UBS received $2,390,000.  (Pl. 56.1 ¶¶ 17-18; Def. 56.1 Resp. ¶¶ 17-18.)  On April 22, 2015, National Union received from UBS final versions of the conditional letters of credit, and on April 27, National Union transferred $2,390,000 to Monarch's account at Sterling Bank.  (Pl. 56.1 ¶¶ 24-25; Def. 56.1 Resp. ¶¶ 24-25.)  On May 1, 2015, National Union learned that Monarch had not deposited the required funds with UBS.  (Pl. 56.1 ¶¶ 26-27; Def. 56.1 Resp. ¶¶ 26-27.)  National Union demanded that Monarch resolve the issue by immediately depositing the funds necessary to make the letters of credit effective, but Monarch took no action, and the letters of credit remain unenforceable.  (Pl. 56.1 ¶¶ 27-29; Def. 56.1 Resp. ¶¶ 27-29.)

DISCUSSION.

> I.    National Union Has Come Forward with Evidence Entitling It to
> Judgment in Its Favor, and Monarch Has Not Responded with Evidence
> <u>that Would Permit a Reasonable Jury to Find In Its Favor.</u>

> A.   <u>Monarch's Contention that It Fully Performed Is Meritless.</u>

Monarch does not dispute the facts set forth by National Union.  It acknowledges

that it entered into an enforceable contract with National Union, and that under the contract,

Monarch was required to supply acceptable letters of credit, in an acceptable form, through a

National Union-approved bank.  (Opp. Mem. 13-14.)

According to Monarch, once it supplied National Union with the placeholder

letters of credit, it fully performed under the contract.  Monarch contends that because National

Union approved the language of the three placeholder letters of credit, including the disclaimer

that the letters were not yet effective, it was not required to take additional actions to make those

letters effective.  (Opp. Mem. 14-16 & Cox Dec. Ex. L.)

Monarch's interpretation of the contract is unreasonable on its face.  It urges that

the bargained-for exchange was the payment of $2,390,000 by National Union in return for

invalid and worthless letters of credit.  A reasonable jury could only conclude that the letters of

credit were intended as placeholder letters to be superseded by live letters of credit, effective

upon Monarch's deposit with the issuing entity of the $2,390,000 received from National Union.

The evidence submitted by Monarch reflects that it promised to submit "live,"

effective letters of credit.  In an exchange of draft letters, Monarch's outside counsel stated, "The

attached draft letters of credit are ready to be issued live by UBS (Brooklyn office) and delivered

to you as soon as you confirm that your client is ready to wire $2.39 million to UBS.  These

letters of credit may be tendered and drawn at sight by any of the several AIG companies listed,"

and in a separate email referred to "those live letters of credit . . . ."  (Cox Dec. Ex. T at 11, 9.)

When Cox first proposed the parties' contract, he wrote: "There is just no way that I can replace

$2,390,000 in LCs in a week – no bank will even draft them that fast even if I had a relationship

with an A rated bank/financial institution."  (Cox Dec. Ex. T at 13.)  Throughout the

communications, the parties discussed the submission of effective or live letters of credit backed

by a deposit of $2,390,000, and not unenforceable placeholder letters.

        A contract must be interpreted "in a manner that accords the words their 'fair and

reasonable meaning,' and achieves 'a practical interpretation of the expressions of the parties.'"

Greenwich Capital Fin. Products, Inc. v. Negrin, 74 A.D.3d 413, 415 (1st Dep't 2010) (quoting

Duane Reade, Inc. v. Cardtronics, LP, 54 A.D.3d 137, 140 (1st Dep't 2008)).  The contract's

requirement that "Monarch post[ ] replacement LOCs on or before May 1, 2015 in an acceptable

form" cannot be fairly and unreasonably interpreted to promise the submission of unenforceable

placeholder letters.  New York law also provides that "[a] contract should not be interpreted to

produce a result that is absurd, commercially unreasonable or contrary to the reasonable

expectations of the parties."  In re Lipper Holdings, LLC, 1 A.D.3d 170, 171 (1st Dep't 2003);

see also Cole v. Macklowe, 99 A.D.3d 595, 596 (1st Dep't 2014) (rejecting interpretation of a

partnership agreement that "represents a windfall to the defendants that is absurd, not

commercially reasonable and contrary to the express terms of the agreement and thus the intent

of the parties.").  It would be absurd and commercially unreasonable to enter into a contract that

gives Monarch a $2,390,000 windfall in exchange for unenforceable placeholder letters.

        The Court concludes that National Union has come forward with evidence that

Monarch breached the contract, and that Monarch's evidence in opposition would not permit a

reasonable jury to find in its favor.

B.  Monarch's "Negligence" Argument Is Meritless.

Monarch also contends that a jury should hear evidence of National Union's purported "negligence" in failing to wire the $2,390,000 directly to UBS.  (Opp. Mem. at 15-16, 18.)  According to Monarch, National Union incorrectly wired the funds to Monarch's own account at Sterling Bank, which was contrary to instructions directing National Union to wire the funds to UBS.

This argument fails for two reasons.  First, Monarch expressly instructed that the funds be wired to Sterling Bank, and second, Monarch itself acknowledges that any negligence by National Union would not defeat National Union's entitlement to collateral.  Because Monarch's argument is unsupported and concededly irrelevant, it does not defeat National Union summary judgment motion.

1.  Monarch's Own Wire Transfer Request Identified Sterling Bank as the Recipient Bank.

According to Monarch, a reasonable jury could conclude that National Union was required to transfer the $2,390,000 directly to UBS, thereby making the letters of credit enforceable, but that National Union failed to do so based on its own error.  It argues that a jury should weigh evidence of this "negligence" when considering National Union's breach of contract claim.

The summary judgment record does not support Monarch's argument.  As described by Monarch, National Union was required to "send the money to the specified account at UBS . . . ."  (Opp. Mem. 16.)  Monarch cites a request contained in an e-mail to National Union from Monarch's outside counsel, which states, "Please process the return of the cash per the UBS wire instructions."  (Opp. Mem. 15-16 & Cox Dec. Ex. T at 1.)

The summary judgment record contains two versions of a wire transfer request issued by Monarch, neither of which supports Monarch's negligence argument. (Cox Dec. Exs. S & Muenz Dec. Ex. M.) Both forms were dated April 20, 2015, signed by Cox, with Cox listed as "Vendor Contact Person," and were issued on Monarch letterhead under the title "CHECK/WIRE TRANSFER REQUEST FORM." (Id.) The first transfer request lists "UBS Financial Services, Inc" as the "Beneficiary Bank Name," with the beneficiary account identified as the "Stuart L. Grant Family Trust." (Munoz Dec. Ex. M.) When National Union received the request, one of its employees replied, "Since this differs from Monarch's name, I'm going to need something that supports this relationship in order for this to get approved." (Cox Dec. Ex. Q at 3.) Goldy separately replied, "Why aren't the funds being returned to Monarch? If we have the ability to return the funds to Monarch then we can avoid any delays?" (Cox Dec. Ex. Q at 2.) National Union's outside counsel replied that "the cash needs to be returned to the same entity that had letters of credit posted with [National Union]." (Cox Dec. Ex. Q at 1.)

The second, revised transfer request form is also dated April 20, 2015. (Cox Dec. Ex. S.) The "Beneficiary Bank Name" is revised to Sterling National Bank, with the "Beneficiary Account Name" listed as "Monarch Payroll, Inc (FKA: Monarch Consulting, Inc)." (Cox Dec. Ex. S.) It appears that this second, revised transfer request was attached to the e-mail from Monarch's outside counsel requesting return of the $2,390,000 "per the UBS wire instructions." (Cox Dec. Ex. T.)

According to Monarch, National Union was negligent because it failed to wire the funds to UBS, even though Monarch forwarded wire instructions that identified Sterling Bank as the beneficiary bank and Monarch as the beneficiary account. But this purported negligence has its origin in two contradictory instructions issued by Monarch itself: an e-mail requesting a

transfer pursuant to "the UBS wire instructions," and a wire transfer request form that identifies Sterling Bank as the recipient bank.  This record does not identify error by National Union.  Indeed, if there was any error, it was on the part of Monarch's own outside counsel, who requested National Union to act contrary to the revised wire transfer request.

There is no dispute that Monarch received the $2,390,000 in its account at Sterling Bank, and that those funds were never deposited with UBS.  The letters of credit did not become effective solely because of Monarch's refusal to deposit the properly wired funds at UBS.  The summary judgment record does not include evidence that supports Monarch's negligence argument.

### 2. Monarch Acknowledges that Its Negligence Argument Does Not Affect National Union's Right to Collateral.

Elsewhere in its brief, Monarch expressly acknowledges that National Union's purported negligence does not affect its right to maintain collateral.  Monarch notes: "For the avoidance of any doubt, Monarch does not contend that National Union's negligence negates any underlying right plaintiff might have to maintain collateral."  (Opp. Mem. at 12 n.5.)  It proceeds to argue that for additional reasons, which are discussed below, National Union is not entitled to retain cash collateral.

Because Monarch acknowledges that its own negligence argument does not affect National Union's entitlement to cash collateral, the purported negligence would not defeat National Union's motion for summary judgment.

### II.   Monarch's Proposed Defenses Do Not Defeat Summary Judgment.

Monarch's opposition memo raises certain defenses that it contends negate National Union's entitlement to cash collateral.  (Opp. Mem. 3-5, 19-20.)  Monarch states, "When issue is joined in this case, Monarch intends to assert as a defense the unenforceability, in

their entirety, of the applicable Payment Agreements." (Opp. Mem. at 3.) These putative

defenses involve separate, ongoing litigations between Monarch and National Union. According

to Monarch, the disputes all challenge National Union's entitlement to hold cash collateral from

Monarch.

> A. Monarch's Arguments Concerning California Regulatory
> Requirements Do Not Directly Relate to the 2015 Contract Disputed in
> <u>This Action.</u>

Monarch contends that the underlying payment agreements between Monarch and

National Union, which were entered into years before the 2015 agreement disputed here, are void

<u>ab initio</u>. Monarch argues that, accordingly, National Union is not entitled to retain cash

collateral under those payment agreements.

Monarch cites to <u>In re Monarch Consulting Inc.</u>, 123 A.D.3d 51 (1st Dep't 2014),

which concluded that arbitration clauses contained in the parties' payment agreements are

unenforceable. Those payment agreements were executed separately from the workers'

compensation policies, and included the requirement that Monarch obtain evergreen letters of

credit to secure the payment of policy deductibles. After Monarch allegedly defaulted under the

payment agreements, National Union demanded arbitration, and Monarch challenged the

demand, contending that the arbitration provisions were void because they did not comply with

California law. <u>Id.</u> at 57. The First Department concluded that section 11658 of the California

Insurance Code and its implementing regulations required National Union to file the payment

agreements with California regulators. <u>Id.</u> at 68-69. Because the payment agreements had not

been filed as required, the First Department concluded that "the arbitration clause <u>and the</u>

<u>payment agreements</u> are void or unenforceable . . . ." <u>Id.</u> at 64 (emphasis added). Monarch notes

that the First Department's decision is currently being appealed to the New York Court of Appeals, and opines that "a reversal is unlikely . . . ."  (Opp. Mem. at 19 n.8.)

According to Monarch, if the payment agreements are unenforceable, they are void <u>ab</u> <u>initio</u>, and National Union is not entitled to retain cash collateral under them.  But Monarch does not argue that the parties' contract in <u>this</u> action was required to be filed with California regulators.  Its argument turns entirely on the enforceability of the separate, earlier payment agreements.  In <u>In re Monarch</u>, Monarch filed its application to stay arbitration proceedings in February 2011.  <u>Monarch Consulting, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA</u>, Index No. 102187/11 (N.Y. Sup. Ct. N.Y. Cnty.)  The parties' ongoing dispute over the enforceability <u>vel</u> <u>non</u> of the payment agreements thus predates by several years their April 2015 agreement to exchange the $2,390,000 in cash collateral for the newly issued letters of credit.

Knowing that the previous payment agreements were potentially void <u>ab</u> <u>initio</u> under California law, Monarch nevertheless chose, in 2015, to enter into a new, independent agreement with National Union.  Monarch now cites to the California filing requirement as a shield that permits it to breach the 2015 contract and retain the $2,390,000 without posting enforceable letters of credit.  As the party opposing summary judgment, it has not presented a legal argument or come forward with evidence that challenges the enforceability of the contract disputed in this action.  <u>See generally</u> <u>Weinstock</u>, 224 F.3d at 31.

Because Monarch does not challenge National Union's entitlement to collateral under <u>this</u> contract, but instead to its entitlement under the earlier policy agreements, it has not come forward with evidence that defeats National Union's motion for summary judgment.

B.  The Other Legal Proceedings Cited by Monarch Do Not Defeat National
Union's Summary Judgment Motion.

Monarch's remaining arguments refer the Court to legal proceedings that have a remote and tenuous relationship to the present dispute.  They do not alter the parties' obligations under the 2015 contract or defeat National Union's summary judgment motion.

Monarch cites to a release it executed in 2014 with Specialty Risk Services ("SRS").  (Opp. Mem. at 4 & Cox. Dec. ¶ 6 & Ex. CC.)  According to Monarch, National Union assigned to SRS the right to collect from Monarch for claims arising between 2005 and 2010.  (Cox Dec. ¶ 6.)  Monarch argues that this release negates National Union's "entitlement to virtually any collateral" from Monarch.  (Opp. Mem. at 4.)  But Monarch does not explain how the release is binding on National Union, which was not a party to the release, and also fails to explain how a release executed in 2014 governs a dispute over a contract that was entered into in 2015.  The SRS release does not defeat the summary judgment motion.

Monarch also argues that summary judgment should be denied because it has brought a separate action challenging National Union's "egregious mishandling" of claims.  Monarch Consulting, Inc. v. National Union Fire Insurance Co. of Pittsburgh, PA, 13-cv-8010 (N.D. Cal. 2013) (Cox Dec. ¶ 8.).  That action has been stayed pending determination of its arbitrability.  (Opp. Mem. at 5.)  Monarch asserts that this dispute over National Union's claims handling should be transferred to this Court and consolidated with the present action.  (Opp. Mem. at 5.)  But Monarch does not explain the relationship between National Union's handling of claims and the parties' performance under the 2015 contract.  Its opposition papers do not attach any filings from the action.  There is no apparent factual nexus between National Union's handling of claims and Monarch's obligation to post letters of credit in an acceptable form.  The

existence of this separate litigation does not defeat National Union's motion for summary judgment.

CONCLUSION.

The defendants' motion to dismiss is GRANTED.  (Docket # 30.)  National Union's motion for summary judgment on its breach of contract claim is GRANTED.  (Docket # 38.)  The Clerk is directed to terminate the motions.

National Union shall submit a proposed final judgment in seven (7) days. Monarch may submit a response to the proposed form of judgment within three (3) days thereafter.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
February 17, 2016